## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEAVER COUNTY EMPLOYEES' RETIREMENT FUND, ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM, AND LACKAWANNA COUNTY EMPLOYEES' RETIREMENT FUND, individually and on behalf of all others similarly situated, | No. **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY, BARCLAYS CAPITAL INC., BMO CAPITAL MARKETS CORP., BNP PARIBAS SECURITIES CORP., CANTOR FITZGERALD & CO., CIBC WORLD MARKETS CORP., CITIGROUP GLOBAL MARKETS INC., COMMERZ MARKETS LLC, CREDIT SUISSE SECURITIES (USA) LLC, DAIWA CAPITAL MARKETS AMERICA INC., DEUTSCHE BANK SECURITIES INC., GOLDMAN, SACHS & CO., HSBC SECURITIES (USA) INC., JEFFERIES LLC, J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MIZUHO SECURITIES USA INC., MORGAN STANLEY & CO. LLC, NOMURA SECURITIES INTERNATIONAL, INC., RBC CAPITAL MARKETS, LLC, RBS SECURITIES INC., SG AMERICAS SECURITIES, LLC, TD SECURITIES (USA) LLC, AND UBS SECURITIES LLC, | |
| Defendants. | |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 2

JURISDICTION AND VENUE ........................................................................................... 5

THE PARTIES..................................................................................................................... 6

FACTUAL ALLEGATIONS ............................................................................................. 15

I.      BACKGROUND ALLEGATIONS...................................................................................15

      A.    U.S. Treasury Securities ..................................................................15

      B.    U.S. Treasury Securities Auctions .........................................................16

      C.    The Secondary Market and U.S. Treasury-Based Instruments............................18

      D.    Multiple Government Investigations Reveal Defendants' Collusion in Manipulating Financial Markets and Benchmarks ............................................20

II.     DEFENDANTS CONSPIRED IN CONNECTION WITH THE U.S. TREASURY SECURITIES AUCTION PROCESS ....................................26

III.   DEFENDANTS ARE AND WERE HORIZONTAL COMPETITORS IN THE U.S. TREASURY SECURITIES AND U.S. TREASURY-BASED INSTRUMENTS MARKETS ..................................................29

IV.   PLAINTIFFS AND MEMBERS OF THE CLASS WERE INJURED AS A RESULT OF DEFENDANTS' CONDUCT ..............................................30

EQUITABLE TOLLING OF THE STATUTES OF LIMITATIONS ............................. 35

CLASS ACTION ALLEGATIONS .................................................................................. 35

CLAIMS FOR RELIEF ..................................................................................................... 38

      FIRST CLAIM FOR VIOLATION OF § 1 OF THE SHERMAN ACT ........................38

      SECOND CLAIM FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT ..................................................40

      THIRD CLAIM FOR PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT............................................41

      FOURTH CLAIM FOR AIDING AND ABETTING MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT ......................................42

PRAYER FOR RELIEF .................................................................................................... 42

DEMAND FOR JURY TRIAL ......................................................................................... 43

1.      Plaintiffs Beaver County Employees' Retirement Fund, Erie County Employees' Retirement System, and Lackawanna County Employees' Retirement Fund (collectively, "Plaintiffs") bring this action on behalf of themselves and other similarly situated investors that purchased or sold bonds, notes, or other marketable securities issued by the United States Department of Treasury ("U.S. Treasury") (collectively, "U.S. Treasury Securities") or futures, options, or other financial instruments based on U.S. Treasury Securities (collectively, "U.S. Treasury-Based Instruments") during the period beginning at least by January 1, 2007 and continuing through the present (the "Class Period") at artificial prices as the result of market manipulation by Defendants (*see* ¶¶ 24-48) who served during the Class Period as "Primary Dealers" in the U.S. Treasury Securities market.

2.      Plaintiffs seek recovery on behalf of themselves and the proposed Class, as defined herein, under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26, and the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*.

3.      Plaintiffs' allegations are based upon personal knowledge as to their own acts and upon information and belief as to all other matters alleged herein, including the investigation of counsel from publicly-available sources of information concerning, *inter alia*: the U.S. Treasury and the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments; regulatory investigations regarding the manipulation and restraint of trade involving the auction of U.S. Treasury Securities and the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments; other regulatory investigations and plea agreements regarding the manipulation and restraint of trade involving the foreign currency exchange ("FX") market and the London Interbank Offered Rate ("LIBOR"), the Euro Interbank Offered Rate ("Euribor"), and the

1

International Swaps and Derivatives Association Fix ("ISDAFix") benchmark; press reports; and regulatory filings.  Additionally, Plaintiffs have retained economic and industry experts to assist in the investigation of these claims and their understanding of the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments.

## NATURE OF THE ACTION

4.      With more than $12.5 trillion dollars in U.S. Treasury Securities currently outstanding, the market for U.S. Treasury Securities is often considered the largest and most liquid securities market in the world.

5.      However, the market for U.S. Treasury Securities "is a fertile area for harmful collusive behavior" given the high volume of U.S. Treasury Securities that change hands daily and the domination of the market by Defendants—a handful of powerful market participants who serve as Primary Dealers in the auction of newly-issued U.S. Treasury Securities by the U.S. Treasury and serve as market makers in the secondary market for U.S. Treasury Securities.[1]

6.      This litigation concerns Defendants' successful attempts to manipulate the auction process that controls the pricing of trillions of dollars in newly-issued U.S. Treasury Securities every year and also influences the prices of U.S. Treasury Securities in the secondary market as well as the prices of U.S. Treasury-Based Instruments, such as exchange-traded U.S. Treasury futures and options.

7.      As part of the competitive auction process for newly-issued U.S. Treasury Securities, Defendants, as Primary Dealers, submit bids to the U.S. Treasury on behalf of clients and themselves that are supposed to reflect the lowest rate, yield, or discount margin at which the bidder would agree to purchase the offered U.S. Treasury Securities.  Defendants' access to their

---

[1]      Alexandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, BLOOMBERG, June 24, 2015.

clients' confidential bids—information detailing pricing and volume demand for trillions of dollars of U.S. Treasury Securities—created an exclusive "insiders club" with tremendous market power.

8.      Ordinarily, Defendants would compete with each other as Primary Dealers in U.S. Treasury Securities auctions, such that in a non-manipulated market, supply and demand fundamentals would shape the prices set for newly-issued U.S. Treasury Securities as a result of the competitive auction bidding process.

9.      However, in violation of the Sherman Antitrust Act and the Commodity Exchange Act, Defendants colluded with each other throughout the Class Period to manipulate the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments through, *inter alia*, manipulation of the auction process for U.S. Treasury Securities.  Specifically, Defendants reportedly shared valuable aggregate client auction bidding order flow with one another, collusive conduct which enabled the Primary Dealers to coordinate auction bidding and/or U.S. Treasury Securities and U.S. Treasury-Based Instruments trading strategies to benefit themselves and their co-conspirators, to the detriment of other investors, including Plaintiffs and members of the Class.

10.      Defendants' sharing and use of non-public information, which was obtained through collusive and secretive communications such as online chatrooms in which "traders swapped gossip about clients' Treasury orders," to inform auction bidding and/or U.S. Treasury Securities and U.S. Treasury-Based Instruments trading decisions created a dysfunction in the normal competitive auction process and impacted the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.[2]  Investors not privy to the

---

[2]      *Id.*

shared confidential information, such as Plaintiffs and members of the Class, participated in the auction process for U.S. Treasury Securities and/or traded in the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments at an informational disadvantage, and were harmed thereby.

11.     Defendants, as active and sophisticated financial institutions, specifically intended to, and did cause, the unlawful and artificial manipulation of prices for U.S. Treasury Securities and U.S. Treasury-Based Instruments and understood, and knew to a substantial certainty, that manipulation of auction prices for U.S. Treasury Securities would have a direct corresponding effect on the secondary market and the market for U.S. Treasury-Based Instruments and would cause actual damages to Plaintiffs and members of the Class.

12.     The intended result of Defendants' conspiracy was to reduce or eliminate their exposure to trading risk and to potentially influence related benchmarks, resulting in Defendants reaping billions of dollars in supra-competitive profits at the expense of unknowing investors including Plaintiffs and members of the Class.

13.     Plaintiffs and members of the Class were harmed when they traded in the U.S. Treasury Securities or U.S. Treasury-Based Instruments markets, and their injuries flowed directly from Defendants' collusive and anticompetitive manipulation of the U.S. Treasury Securities and U.S. Treasury-Based Instrument markets.  Defendants were fully aware of the foreseeable consequences of their collusive, manipulative, and anticompetitive conduct.

14.     As reported by the *New York Post* and *Bloomberg* on June 8, 2015 and June 10, 2015, respectively, the United States Department of Justice (the "Justice Department") has recently begun investigating Defendants' unlawful conduct as Primary Dealers in association with U.S. Treasury Securities auctions, which mirrors admitted conspiracies by certain financial

institutions to manipulate other financial markets and benchmarks by sharing confidential information and aligning trading strategies with competitors and third-party brokers.[3]  A number of the Defendants (or their affiliates) already have pled guilty to conspiring to manipulate the FX market and/or financial benchmarks such as LIBOR, Euribor, and/or the U.S. Dollar ISDAfix, have paid billions of dollars in fines to U.S. and foreign regulators, and/or have entered into private settlements with investors.  The manipulation of the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments appears to flow along a continuum of manipulation of benchmarks and other financial markets by financial institutions seeking substantial (and illegal) profits.

15.     Plaintiffs believe that further evidentiary support will be developed after a reasonable opportunity to conduct discovery in this case.  Except as alleged in this Complaint, Plaintiffs and members of the Class do not have access to the underlying facts relating to Defendants misconduct, as that information is exclusively within the possession and control of Defendants and their co-conspirators.  This prevents Plaintiffs from further detailing Defendants' unlawful conduct at this time.   The ongoing Justice Department investigation, as well as Plaintiffs' counsel's own investigation, may present further information to support the claims alleged herein.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

---

[3]     Kevin Dugan, *Justice Department probes banks for rigging Treasuries market*, NEW YORK POST, June 8, 2015; Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG, June 10, 2015.

17.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15(a), 22, and 26, Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25(c), and 28 U.S.C. §1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.     Each Defendant is subject to personal jurisdiction because each transacted business throughout the United States, including in this District, including by transacting in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and members of the Class throughout the United States and in this District.

19.     Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to, and did in fact, have a substantial effect on, foreign and interstate commerce.  During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

20.     Defendants' collusive, manipulative, and anticompetitive conduct alleged herein had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims.

<u>**THE PARTIES**</u>

<u>**Plaintiff**</u>

21.     Plaintiff Beaver County Employees' Retirement Fund provides retirement benefits for employees of Beaver County, Pennsylvania.  Beaver County Employees' Retirement Fund transacted in U.S. Treasury Securities during the Class Period at manipulated prices that were caused by Defendants' collusive, manipulative, and anticompetitive conduct, resulting in injury to its business or property by reason of Defendants' violations of law, as alleged herein.

22.     Plaintiff Erie County Employees' Retirement System provides retirement benefits for employees of Erie County, Pennsylvania.  Erie County Employees' Retirement System transacted in U.S. Treasury Securities during the Class Period at manipulated prices that were caused by Defendants' collusive, manipulative, and anticompetitive conduct, resulting in injury to its business or property by reason of Defendants' violations of law, as alleged herein.

23.     Plaintiff Lackawanna County Employees' Retirement Fund provides retirement benefits for employees of Lackawanna County, Pennsylvania.  Lackawanna County Employees' Retirement Fund transacted in U.S. Treasury Securities during the Class Period at manipulated prices that were caused by Defendants' collusive, manipulative, and anticompetitive conduct, resulting in injury to its business or property by reason of Defendants' violations of law, as alleged herein.

**Defendants**

24.     Defendant Bank of Nova Scotia, New York Agency is an uninsured state agency of The Bank of Nova Scotia, and maintains its principal offices in New York, New York.  As used herein, "Bank of Nova Scotia" includes Defendant Bank of Nova Scotia, New York Agency and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Bank of Nova Scotia served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

25.     Defendant Barclays Capital Inc. is a Connecticut corporation with its principal offices in New York, New York.  As used herein, "Barclays" includes Defendant Barclays Capital Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Barclays served as a Primary Dealer of U.S. Treasury Securities and

transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

26.     Defendant BMO Capital Markets Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "BMO" includes Defendant BMO Capital Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, BMO served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

27.     Defendant BNP Paribas Securities Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "BNP" includes Defendant BNP Paribas Securities Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, BNP served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

28.     Defendant Cantor Fitzgerald & Co. is a general partnership organized under the laws of the State of New York, and maintains its principal offices in New York, New York.  As used herein, "Cantor" includes Defendant Cantor Fitzgerald & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Cantor served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

29.     Defendant CIBC World Markets Corp. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "CIBC" includes Defendant CIBC World Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and

successors.   During the Class Period, CIBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

30.     Defendant Citigroup Global Markets Inc. is a New York corporation with its principal offices in New York, New York.   As used herein, "Citigroup" includes Defendant Citigroup Global Markets Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors, including Citibank N.A.   During the Class Period, Citigroup served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

31.     Defendant Commerz Markets LLC, formerly known as Dresdner Kleinwort Securities LLC, is a Delaware corporation with its principal offices in New York, New York.   As used herein, "Commerz" includes Defendant Commerz Markets LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, Commerz, under its former name, served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

32.     Defendant Credit Suisse Securities (USA) LLC is a Delaware company with its principal offices in New York, New York.   As used herein, "Credit Suisse" includes Defendant Credit Suisse Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.   During the Class Period, Credit Suisse served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

33.     Defendant Daiwa Capital Markets America Inc. is a New York corporation with its principal offices in New York, New York.  As used herein, "Daiwa" includes Defendant Daiwa Capital Markets America Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Daiwa served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

34.     Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Deutsche Bank" includes Defendant Deutsche Bank Securities Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Deutsche Bank served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

35.     Defendant Goldman, Sachs & Co. is a New York corporation with its principal offices in New York, New York.  As used herein, "Goldman Sachs" includes Defendant Goldman, Sachs & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Goldman Sachs served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

36.     Defendant HSBC Securities (USA) Inc. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "HSBC" refers to HSBC Securities (USA) Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, HSBC served as a Primary Dealer of U.S. Treasury Securities and

transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

37.     Defendant Jefferies LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "Jefferies" refers to Jefferies LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Jefferies served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

38.     Defendant J.P. Morgan Securities LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "JPMorgan" includes Defendant J.P. Morgan Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, JPMorgan served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

39.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Merrill Lynch" includes Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Merrill Lynch served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

40.     Defendant Mizuho Securities USA Inc. is a Delaware corporation with its principal offices in New York, New York.  As used herein, "Mizuho" includes Defendant Mizuho Securities USA Inc. and its parent companies, subsidiaries, affiliates, predecessors, and

11

successors.  During the Class Period, Mizuho served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

41.     Defendant Morgan Stanley & Co. LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "Morgan Stanley" includes Defendant Morgan Stanley & Co. LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Morgan Stanley served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

42.     Defendant Nomura Securities International, Inc. is a New York corporation with its principal offices in New York, New York.  As used herein, "Nomura" includes Defendant Nomura Securities International, Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, Nomura served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

43.     Defendant RBC Capital Markets, LLC is a Minnesota company with offices in New York, New York.  As used herein, "RBC" includes Defendant RBC Capital Markets, LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, RBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

44.     Defendant RBS Securities Inc. is a Delaware corporation with its principal offices in Stamford, Connecticut.  As used herein, "RBS" includes Defendant RBS Securities Inc. and

its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, RBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

45.     Defendant SG Americas Securities, LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "SG Americas" includes Defendant SG Americas Securities, LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, SG Americas served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

46.     Defendant TD Securities (USA) LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "TD Securities" includes Defendant TD Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, TD Securities served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

47.     Defendant UBS Securities LLC is a Delaware company with its principal offices in New York, New York.  As used herein, "UBS" includes Defendant UBS Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.  During the Class Period, UBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments with Plaintiffs and/or members of the Class.

48.     Bank of Nova Scotia, New York Agency, Barclays Capital Inc., BMO Capital Markets Corp., BNP Paribas Securities Corp., Cantor Fitzgerald & Co., CIBC World Markets Corp., Citigroup Global Markets Inc., Commerz Markets LLC, Credit Suisse Securities (USA) LLC, Daiwa Capital Markets America Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., Jefferies LLC, J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mizuho Securities USA Inc., Morgan Stanley & Co. LLC, Nomura Securities International, Inc., RBC Capital Markets, LLC, RBS Securities Inc., SG Americas Securities, LLC, TD Securities (USA) LLC, and UBS Securities LLC are collectively referred to herein as "Defendants" or "Primary Dealers."

49.     Whenever reference is made in this Complaint to any act, deed, or transaction of any Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, affiliates, employees, or representatives while such individuals or entities were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.

50.     Various other non-parties also participated as co-conspirators, performed acts, and made statements in furtherance of the conspiracy.  Plaintiffs reserve the right to identify other co-conspirators and to subsequently name some or all such co-conspirators, whether identified here or not, as Defendants.

51.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.  Each Defendant acted as the agent or co-conspirator of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.      BACKGROUND ALLEGATIONS**

      **A.      U.S. Treasury Securities**

52.      U.S. Treasury Securities are governmental debt instruments routinely issued by the U.S. Treasury in order to finance the U.S. federal government's debt.  U.S. Treasury Securities consist of five primary types of instruments: Treasury Bills; Treasury Notes; Treasury Bonds; Treasury Inflation-Protected Securities ("TIPS"); and Floating Rate Notes ("FRNs").

53.      Treasury Bills are marketable securities sold in increments of $100 and are generally issued in four term-lengths: 4-week Treasury Bills; 13-week Treasury Bills; 26-week Treasury Bills; and 52-week Treasury Bills.  Treasury Bills pay interest at maturity in the form of the difference between the initial sales price (the discount rate) and the Treasury Bill's face value.

54.      Treasury Notes are marketable securities sold in increments of $100 and are issued in five term-lengths: 2-year Treasury Notes; 3-year Treasury Notes; 5-year Treasury Notes; 7-year Treasury Notes; and 10-year Treasury Notes.  Treasury Notes pay interest every six months until maturity.

55.      Treasury Bonds are marketable securities sold in increments of $100 and are issued in a 30-year term-length.  Treasury Bonds pay interest every six months until maturity.

56.      TIPS are marketable securities for which the principal is adjusted to correspond to changes in inflation rates, as determined by the U.S. Consumer Price Index.  If the U.S. Consumer Price Index increases, the principal amount of the TIPS increases.  If the U.S. Consumer Price Index deceases, the principal amount of the TIPS decreases.  TIPS are sold in increments of $100 and are issued in three term-lengths: 5-year TIPS; 10-year TIPS; and 30-year TIPS.

15

57.     FRNs are marketable securities for which the interest rates vary based on current discount rates for 13-week Treasury Bills.  FRNs are sold in increments of $100 and are issued in a 2-year term-length.

### B.     U.S. Treasury Securities Auctions

58.     New issuances of U.S. Treasury Securities are sold to individual and institutional investors through public auctions conducted by the U.S. Treasury.  U.S. Treasury Securities auctions occur regularly and according to a set schedule (for example, 4-week, 13-week, and 26-week Treasury Bills are auctioned weekly while 30-year Treasury Bonds are auctioned quarterly).

59.     The auction process consists of three steps: (1) announcement of the auction; (2) bidding; and (3) issuance of the purchased U.S. Treasury Securities.  Several days before an auction is to occur, the U.S. Treasury publishes a detailed announcement on the U.S. Treasury's website and in the financial sections of many major newspapers.  The announcement of an auction identifies the total face value amount of the specific U.S. Treasury Security being offered, the auction date, the issue date, the maturity date, the terms and conditions of the offering, the investors eligible to participate, the closing times for the bidding window, and other pertinent information.

60.     Once the auction has been announced by the U.S. Treasury, investors may bid on the offered U.S. Treasury Security via two bidding methods: non-competitive bidding and competitive bidding.

61.     If electing to submit a non-competitive bid, an investor submits a bid to the U.S. Treasury indicating that it will accept a specified amount of the offered U.S. Treasury Security and will pay the final price of the offered U.S. Treasury Security as determined under the competitive auction process.  Each investor is limited to the purchase through non-competitive

bids of $5 million of the total amount of the offered U.S. Treasury Security.  Submitting a non-competitive bid guarantees that the investor's bid will be accepted and filled.  Non-competitive bids may be submitted through a Primary Dealer or directly through the U.S. Treasury's TreasuryDirect system.

62.     If electing to submit a competitive bid, an investor submits a bid to the U.S. Treasury indicating that it will accept a specified amount of the offered U.S. Treasury Security and the lowest discount rate, yield, or discount margin they are willing to pay for the offered U.S. Treasury Security.  For example, if an investor is bidding on a 2-year Treasury Note (with a $100 face value and a stated interest rate of 0.625%), it may submit a bid indicating that it will pay no more than $99.80 per note, resulting in a yield of approximately 0.635%.  Each investor is limited to the purchase through competitive bids of no more than 35% of the total amount of the offered U.S. Treasury Security.

63.     Unlike investors submitting non-competitive bids, investors submitting competitive bids are not guaranteed to receive any portion of the offered U.S. Treasury Security. Instead, after the close of the bidding window, the U.S. Treasury identifies the successful bidders by matching up bids in increasing order of specified discount rate, yield, or discount margin until all of the offered U.S. Treasury Security (not already assigned to the non-competitive bidders) is accounted for.  For example, an investor submitting a bid of $99.80 per note would have its order filled before an investor submitting a bid of $99.70 per note would have its order filled.

64.     Once the entire amount of the offered U.S. Treasury Security is accounted for under the auction process, the purchase price is established based on the discount rate, yield, or discount margin of the last bid that had been accepted (the "High Discount Rate," "High Yield," or "High Margin").  For example, if an investor submitting a bid of $99.80 per note is the last

17

investor to have its order filled, all investors submitting bids higher than $99.80 per note would have their order filled and would pay $99.80 per note. Similarly, all investors submitting bids lower than $99.80 per note would not receive any portion of the offered U.S. Treasury Security.

65.     As Primary Dealers, Defendants play a particularly important role in determining the ultimate purchase price of an offered U.S. Treasury Security given that competitive bidding typically requires investors to use a Primary Dealer or utilize the U.S. Treasury's TAAPS account system (which is limited to institutional investors) to submit bids. As demonstrated by the recently completed auction of 3-year Treasury Notes on June 9, 2015, more than 75% of all competitive bids were submitted through a Primary Dealer. As such, bids submitted by Primary Dealers have a significant influence on the bidding process which sets the purchase price for the offered U.S. Treasury Security.

66.     Within a few days of the announcement of the auction results, the offered U.S. Treasury Securities are issued to investors by the U.S. Treasury.

67.     In 2014, the U.S. Treasury completed 270 public auctions and issued approximately $7.0 trillion in U.S. Treasury Securities.

**C.     The Secondary Market and U.S. Treasury-Based Instruments**

68.     After U.S. Treasury Securities are issued to investors through public auctions, the U.S. Treasury Securities may be re-traded among investors in a secondary market consisting of more than $12.5 trillion in outstanding U.S. Treasury Securities.

69.     In the secondary market, U.S. Treasury Securities are sold in an over-the-counter market in which the Primary Dealers serve as market makers, providing liquidity to investors through the continual availability of bid/ask spreads for the purchase and sale of U.S. Treasury Securities. The prices realized in the secondary market for U.S. Treasury Securities are impacted

by several factors including supply and demand, changes in interest rates, and the results (*i.e.*, prices and yields) of auctions of newly issued U.S. Treasury Securities.

70.     In addition to trading in the secondary market, U.S. Treasury Securities form the basis of several U.S. Treasury-Based Instruments, including futures and options that are traded extensively on the Chicago Board of Trade ("CBOT")—a futures and options exchange operated since 2007 by CME Group Inc.

71.     U.S. Treasury futures and options on the CBOT are available for trade 23-hours a day, Sunday through Friday, and are utilized by investors both to hedge exposure to changes in interest rates and to seek profit on anticipated changes in interest rates.

72.     U.S. Treasury futures available on the CBOT include: 2-year Treasury Note Futures (representing a contract for delivery of a 2-year Treasury Note with a face value of $200,000); 3-year Treasury Note Futures (representing a contract for delivery of a 3-year Treasury Note with a face value of $200,000); 5-year Treasury Note Futures (representing a contract for delivery of a 5-year Treasury Note with a face value of $100,000); 10-year Treasury Note Futures (representing a contract for delivery of a 10-year Treasury Note with a face value of $100,000); and Treasury Bond and Ultra Treasury Bond Futures (representing a contract for delivery of a Treasury Bond with a face value of $100,000).

73.     With approximately 7 million U.S. Treasury futures contracts—representing contracts for delivery of $830 billion in U.S. Treasury Securities—open as of the close of trading on June 24, 2015, the market for U.S. Treasury futures is extensive.

74.     U.S. Treasury options available on the CBOT include: 2-year Treasury Note Options (representing a contract for delivery of a 2-year Treasury Note Futures contract); 5-year Treasury Note Options (representing a contract for delivery of a 5-year Treasury Note Futures

contract); 10-year Treasury Note Options (representing a contract for delivery of a 10-year Treasury Note Futures contract); T-Bond Options (representing a contract for delivery of a Treasury Bond Futures contract); and Ultra T-Bond Options (representing a contract for delivery of an Ultra Treasury Bond Futures contract).

75.     Like the market for U.S. Treasury futures, the market for U.S. Treasury options is extensive, with approximately 5.5 million U.S. Treasury options open as of the close of trading on June 24, 2015.

**D.     Multiple Government Investigations Reveal Defendants' Collusion in Manipulating Financial Markets and Benchmarks**

76.     On June 8, 2015, the *New York Post* reported that the Justice Department is investigating "possible fraudulent manipulation" of the market for U.S. Treasury Securities including manipulation of "Treasury auctions, a secretive process when interest rates are set for the offerings" and had reached out to certain Primary Dealers to request information.[4]

77.     The Justice Department probe into the market for U.S. Treasury Securities follows multiple regulatory probes into allegations that banks, including certain Primary Dealers, conspired to manipulate the FX market and financial benchmarks such as LIBOR,[5] Euribor,[6] and the U.S. Dollar ISDAfix.[7]   These probes resulted in numerous settlements between regulators and many financial institutions, including certain of the Defendants (or their affiliates).

---

[4]     Kevin Dugan, *Justice Department probes banks for rigging Treasuries market*, NEW YORK POST, June 8, 2015.

[5]     LIBOR is a series of benchmarks used as reference rates for short-term interest rates and is published in a variety of currencies and maturities.

[6]     Euribor is a series of benchmarks used as reference rates for short-term interest rates and it published in Euro denominations over a variety of maturities.

[7]     ISDAfix is a series of benchmarks used as reference rates for fixed interest portions of interest rate swaps and is published in a variety of currencies and maturities.

78.     The first major investigation into the manipulation of financial markets and benchmarks was a result of the LIBOR scandal, which revealed that, as early as 2005, banks were systematically attempting to rig LIBOR for financial gain.  Investigations into the LIBOR manipulation were coordinated between the United States and multiple foreign authorities and resulted in criminal and regulatory charges, and billions of dollars in fines paid by certain of the targeted financial institutions, including certain Defendants and their affiliates.

79.     The LIBOR investigation revealed emails and other evidence showing that financial institutions, including certain of the Defendants, colluded to provide false rate quotes to move the LIBOR benchmark in a manner that would benefit the financial institutions.  As a result of the LIBOR investigation, UBS Group AG—the ultimate parent company of Defendant UBS Securities LLC—pled guilty to a wire-fraud charge related to interest rate manipulation and agreed to cooperate in providing evidence to regulators.

80.     On December 19, 2012, in connection with UBS Group AG's $1.5 billion settlement in LIBOR, it was revealed that manipulation was not only taking place between co-worker traders within certain financial institutions but also involved collusion among the financial institutions and with third-party brokers.  According to U.K. authorities, UBS Group AG ignored "the integrity of benchmarks [which] are of fundamental importance to . . . international financial markets."[8]

81.     Deutsche Bank AG—the ultimate parent company of Defendant Deutsche Bank Securities Inc.—also settled with U.S. and U.K. regulators and was ordered to pay a $2.5 billion fine and fire seven employees for its role in rigging LIBOR.  Benjamin Lawsky, the Superintendent of New York's Department of Financial Services (the "NYDFS"), stated that

---

[8]     Mark Scott and Ben Protess, *As Unit Pleads Guilty, UBS Pays $1.5 Billion Over Rate Rigging*, THE NEW YORK TIMES, December 19, 2012.

"Deutsche Bank employees engaged in a widespread effort to manipulate benchmark interest rates for financial gain."[9]

82.     After uncovering unlawful and anticompetitive collusion in setting LIBOR by certain financial institutions, and requiring the implicated financial institutions to pay billions of dollars in fines, regulators looked to other financial benchmarks to determine whether the collusive conduct was widespread such that additional markets, including the FX market, were similarly manipulated to benefit certain financial institutions.  Many of the defendants who signed settlement agreements related to LIBOR agreed to cooperate in future investigations and face criminal penalties if they withheld evidence.

83.     The FX market investigations by U.S. and foreign regulators revealed similar widespread collusion and market manipulation by financial institutions.  Certain financial institutions—including the ultimate parent companies of Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Barclays Capital Inc., and RBS Securities Inc.—pled guilty to felony charges of conspiring to manipulate the price of U.S. Dollars and Euros by, *inter alia*, using invitation-only chatrooms and coded language to coordinate trades, and paid $5.8 billion in fines and penalties.

84.     Other financial institutions, not involved in the plea deals, also agreed to pay fines based on the allegations.  The total fines and penalties paid by banks to the Justice Department, the U.S. Commodity Futures Trading Commission ("CFTC"), the Federal Reserve, and the United Kingdom's Financial Conduct Authority have amounted to approximately $9 billion.  In addition, numerous financial institutions terminated employees who were involved in the FX conspiracy.

---

[9]      Antoine Gara, *Deutsche Bank Pays $2.5 Billion To Settle LIBOR Manipulation Suit*, FORBES, April 23, 2015.

85.     *Bloomberg* quoted Justice Department sources who stated the banks' traders "described themselves as . . . 'The Cartel'" and "used online chat rooms to discuss their positions before the rates were set and suppress competition in the market" for FX currencies.[10]

86.     U.S. Attorney General Loretta Lynch has described the banks' scheme as a "brazen display of collusion" and vowed that the Justice Department would "vigorously prosecute all those who tilt the economic system in their favor, who subvert our marketplaces, and who enrich themselves at the expense of American consumers."[11]

87.     Regulators also began investigating whether traders from competing financial institutions and brokers conspired to manipulate the ISDAfix, a pricing reference rate for the fixed-rate portion of an interest rate swap.  The ISDAfix is meant to serve as an average mid-market rate for six major currencies at selected maturities and reflect the competitive forces of supply and demand in the interest rate derivatives market.

88.     During the relevant period, the USD ISDAfix reference rate was administered by ICAP Plc ("ICAP") at 11:00 a.m. Eastern time daily and comprised of: (1) the most recent swap spreads from completed trades and executable bids and offers in market size done/posted at ICAP; and (2) executed trades and executable bids offers at 11:00 a.m. Eastern time for U.S. Treasury Securities from ICAP's BrokerTec U.S. Treasury electronic trading platform.

89.     The fourteen financial institutions that dominated the market for interest rate derivatives and set the ISDAfix during the daily polling window—including certain of the

---

[10]     David McLaughlin, Tom Schoenberg, and Gavin Finch, *Six Banks Pay $5.8 Billion, Five Guilty of Market Rigging*, BLOOMBERG, May 20, 2015.

[11]     U.S. Department of Justice, *Attorney General Lynch Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation*, May 20, 2015, http://www.justice.gov/opa/speech/attorney-general-lynch-delivers-remarks-press-conference-foreign-exchange-spot-market.

Defendants (or its affiliates)—were accused of anticompetitive conduct in violation of the antitrust laws and market manipulation in violation of the Commodity Exchange Act.

90.     Allegations surfaced that the financial institutions communicated with each other and ICAP through electronic chatrooms, email, instant messages, and private telephone calls to determine when and how to manipulate the ISDAfix to their benefit and used methods of market manipulation such as: (1) banging the close (*i.e.*, executing a series of rapid-fire trades and submitting executable bids and offers that were not reflective of the market but, rather, based on a desire to move the ISDAfix rate in a manner that would benefit the banks); (2) conspiring to submit identical off-market rate quotes to ICAP; and (3) conspiring with ICAP to delay publication of trades on certain swap transactions until the polling period was over.

91.     On May 20, 2015, the CFTC announced its settlement with Defendant Barclays Capital Inc. and certain of its affiliates, stating that the CFTC "has reason to believe" that "beginning at least as early as January 2007" Barclays "violated the Commodity Exchange Act" by attempting to manipulate the ISDAfix.[12]

92.     In connection with the settlement order, the CFTC published emails and audio recordings of Barclays traders colluding within the bank and with third-party brokers to manipulate the ISDAfix rate in Barclays's favor so that it could maximize its trading positions and increase profits.  Strategies employed by the bank's traders included, among other things, making false ISDAfix reports, timing trading to manipulate the ISDAfix with spending as little "ammunition" as possible, and trading swaps and U.S. Treasury Securities to keep ISDAfix spreads up or down when it would benefit the bank's cash settlements.

---

[12]     *In the Matter of: Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC Docket No, 15 – 25 (C.F.T.C. filed May 20, 2015).

93.     The CFTC included an example of a trader's attempt to manipulate the market for U.S. Treasury Securities in its May 2015 settlement with Barclays.  In one of the published emails, a Barclays trader from the bank's options trading desk emailed a trader on the bank's U.S. Treasury Securities desk stating: "I have an exercise at 11am this morning, I will need to sell 635 5s, but I want to push the screens down at 11, as much as . . . you can, so that I can get a better 11 am print."[13]  As noted by the CFTC, artificially pushing down the price of 5-year Treasury Notes would increase the yield on 5-year Treasury Notes in the secondary market, thereby increasing the 5-year USD ISDAfix.[14]  Such manipulation would benefit Barclays in its settlement of trades that day to the detriment of its trade counterparties and other investors in U.S. Treasury Securities and U.S. Treasury-Based Instruments markets (as well as investors in the swaps market).

94.     After one such exercise in coordinated trading manipulation, a Barclays trader told the co-conspiring broker: "Yeah, you did well at the 11 o'clock fix, man," and it "sounded like you were actually holding up the spreads with your hands; like, it felt like you were bench pressing them over your head."[15]

95.     As part of its settlement with the CFTC, Barclays Capital Inc. and certain of its affiliates agreed to pay $115 million and institute remedial measures designed to maintain the integrity of the markets and benchmarks.

---

[13]     *Id.*

[14]     *Id.*

[15]     *Id.*

## II.     DEFENDANTS CONSPIRED IN CONNECTION WITH THE U.S. TREASURY SECURITIES AUCTION PROCESS

96.     As discussed herein, in June 2015, multiple news sources reported that the Justice Department had begun investigating certain financial institutions and their roles in manipulation of the U.S. Treasury Securities market—like the LIBOR and ISDAfix benchmarks and the FX market—including through the manipulation of the U.S. Treasury auctions that set the prices for U.S. Treasury Securities.[16]

97.     On information and belief, beginning at least as early as January 1, 2007, Defendants, as Primary Dealers, conspired to manipulate the market for U.S. Treasury Securities and U.S. Treasury-Based Instruments.  Rather than competing honestly in the bidding process to determine a competitive market price for U.S. Treasury Securities, as intended by the U.S. Treasury's auction process, Defendants, as Primary Dealers, shared with each other valuable competitively sensitive client auction bidding order flow—including information regarding whether demand is high or low, sizes of client bids, and requested yields and discount rates—in order to coordinate auction activities in a manner that would benefit Defendants, to the detriment of other investors in the market.  Based on this shared confidential information, Defendants executed concerted bidding and/or trading strategies designed to manipulate, and which actually did manipulate, the auction of U.S. Treasury Securities, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments such as futures and options.

98.     As noted above, during the bidding window of a U.S. Treasury Security auction, Defendants, in their role as Primary Dealers, are channeled billions of dollars in bids for U.S. Treasury Securities by their clients.  On information and belief, Defendants' salespeople shared

---

[16]     *See, e.g.*, Kevin Dugan, *Justice Department probes banks for rigging Treasuries market*, NEW YORK POST, June 8, 2015; Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG, June 10, 2015.

this confidential information with their own traders so that the information could be used to benefit Defendants' trading positions. Non-public market intelligence shared between salespeople and traders, such as knowledge of pending client bids during the bidding window leading up to the completion of an auction of a U.S. Treasury Security, can be used by Defendants to improve their respective trading positions in the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.

99. Defendants not only shared information among their own employees to bolster trading positions, but also shared confidential client auction bidding order flow with each other in order to collude to rig the auction of U.S. Treasury Securities, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments. Here, as in the FX market manipulation, traders aligned strategies with their purported competitors in order to improve their chances of effectuating the desired movements in the markets.

100. On June 24, 2015, *Bloomberg* further reported that "[a]ntitrust officials at the Justice Department are investigating trading related to Treasuries" and quoted sources stating that traders at certain Primary Dealers "have talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders as recently as last year."[17]

101. On information and belief, Defendants' traders conspired by communicating confidential client-sensitive information, such as client auction bidding order flow, with each other via private phone calls, emails, text messages, and/or online chatrooms during the bidding window of U.S. Treasury Securities auctions. Sharing aggregate confidential information regarding client auction bidding order flow allowed Defendants to determine in advance the likely result of the auction and how the secondary market for U.S. Treasury Securities and the

---

[17] Alexandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, BLOOMBERG, June 24, 2015.

market for U.S. Treasury-Based Instruments would move.  Defendants' collusive actions allowed them to minimize and/or eliminate their trading risk in U.S. Treasury Securities and U.S. Treasury-Based Instruments and to reap supracompetitive profits at the expense of Plaintiffs and members of the Class.

102.    There is no reason for Defendants—as competitors in the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments—to share competitively sensitive information, such as client auction bidding order flow, with each other during the bidding window of U.S. Treasury Securities auctions absent the intent to engage in collusive, manipulative, and anticompetitive conduct.

103.    Without manipulation and collusion, Defendants faced greater risk that the markets would move against them when they executed trades.  By creating a dysfunction in pricing through a manipulated auction process, Defendants created an artificial bid/ask spread and realized risk-free or risk-reduced returns for members of their conspiracy.  By trading on non-public information, Defendants' well-informed traders gained a considerable advantage over uninformed traders.  Defendants benefitted by their collusion to rig the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments through reduced risk, decreased losses, and increased profits, at the expense of Plaintiffs and members of the Class.

104.    As a direct result of the government probes into financial institutions' conspiracies to manipulate markets and financial markets, many Defendants, including Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS, now prohibit their traders from participating in multibank chatrooms.

105.    The markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments were distorted by Defendants' collusive, manipulative, and anticompetitive efforts such that Plaintiffs and members of the Class were harmed.

**III.    DEFENDANTS ARE AND WERE HORIZONTAL COMPETITORS IN THE U.S. TREASURY SECURITIES AND U.S. TREASURY-BASED INSTRUMENTS MARKETS**

106.    Defendants are, and were during the Class Period, horizontal competitors in both the U.S. Treasury Securities market and the market for U.S. Treasury-Based Instruments as Primary Dealers, market makers, and direct market participants.  In the U.S. Treasury Securities market, Defendants compete with each other in three ways: (1) as Primary Dealers bidding on behalf of their clients and on their own behalf in the auction of U.S. Treasury Securities; (2) as market makers in the secondary market for U.S. Treasury Securities, offering clients access to the market at competitive terms, including bid/ask spreads; and (3) as traders for their own accounts by seeking profits from investment positions in U.S. Treasury Securities and U.S. Treasury-Based Instruments.  For example, in the market for U.S. Treasury-Based Instruments, Defendants compete against each other as direct market participants by seeking profits by using futures and options to take net-long and net-short positions in the U.S. Treasury Securities market.

107.    Absent collusion, Defendants would seek to achieve the best price and terms in U.S. Treasury Securities auctions and their trading positions, and corresponding profits or losses would be determined through competition with other traders, including other Defendants.  Competition among Defendants would contribute to efficiency in U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments.  Defendants' collusion and coordinated market activities had adverse consequences on competition and created artificial and manipulated markets.

29

108.    During the Class Period, Defendants transacted in U.S. Treasury Securities and U.S. Treasury-Based Instruments, including exchange-traded U.S. Treasury futures and options. Through their collusive conduct, Defendants manipulated the U.S. Treasury Securities auction process and/or artificially manipulated prices in the secondary market to benefit their own and/or their co-conspirators' trading positions in U.S. Treasury Securities and U.S. Treasury-Based Instruments.

109.    As alleged herein, Defendants' conduct injured competition and the interplay of supply and demand in U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments.  This collusive manipulation of the markets had an immediate, direct, substantially certain, and foreseeable impact on the prices of U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments.

## IV.    PLAINTIFFS AND MEMBERS OF THE CLASS WERE INJURED AS A RESULT OF DEFENDANTS' CONDUCT

110.    Defendants, as Primary Dealers participating in U.S. Treasury Securities auctions, were in a unique position to manipulate the pricing of the auctions and the corresponding secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.

111.    Defendants' manipulation of the U.S. Treasury Securities auctions caused a dysfunction in the normal competitive auction process and impacted the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.  Through their collusion in the auction process, Defendants artificially affected the purchase prices and yields of U.S. Treasury Securities in the auction, the prices and yields of U.S. Treasury Securities in the

secondary market, and the prices of U.S. Treasury-Based Instruments, such as futures and options traded on the CBOT, to the detriment of Plaintiffs and members of the Class.

112.    Defendants were each in a position to benefit from the manipulation of the U.S. Treasury Securities auctions, the corresponding secondary market, and the market for U.S. Treasury-Based Instruments in numerous ways, including but not limited to: (1) moving the price for U.S. Treasury Securities set by the Treasury auctions in a direction that would benefit Defendants and their co-conspirators; (2) maintaining an anticompetitive "spread" or difference between the bid and ask prices at which they offered to buy and sell U.S. Treasury Securities in the secondary market; and/or (3) "front-running" the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments (*i.e.*, trading ahead of other investors based on non-public information that will influence the price of the underlying security) in order to benefit their trading positions, and the trading positions of their co-conspirators, to the detriment of market participants including Plaintiffs and members of the Class.

113.    One example of the mechanisms which Defendants utilized to reap artificial and anticompetitive gains was the purchase and sale of "When-Issued" U.S. Treasury Securities—synthetic securities that represent the U.S. Treasury Securities in a pending auction and trade between the date of the auction announcement and the date the U.S. Treasury issues the relevant U.S. Treasury Securities.

114.    By sharing confidential client auction bidding order flow and coordinating market activities, Defendants were able to take long or short positions in the When-Issued market in advance of a U.S. Treasury Security auction.  If Defendants anticipated that the auction price would be lower than the current When-Issued price, Defendants could take short positions by

agreeing to sell the When-Issued security and subsequently covering their positions by obtaining the corresponding U.S. Treasury Securities at lower prices in the auction or in the post-auction secondary market.  Similarly, if Defendants anticipated that the auction price would be higher than the current When-Issued price, Defendants could take long positions by agreeing to purchase the When-Issued security and subsequently covering their positions by selling the corresponding U.S. Treasury Securities at higher prices in the post-auction secondary market.

115.   Plaintiffs have retained economics experts to analyze anomalies in the U.S. Treasury Securities markets surrounding U.S. Treasury auctions.  Among other things, Plaintiffs' experts analyzed the difference or "Market Tail" between the When-Issued price immediately prior to the close of a U.S. Treasury Auction at 1:00pm and the issuing price of the U.S. Treasury Security (the "Auction Stop Yield Price").  The chart below depicts the relationship between the When-Issued price, the Auction Stop Yield Price, the Market Tail, and the "On-the-Run" trading price of the previously issued offering of the same U.S. Treasury Security:



116.   In a well-functioning, non-manipulated market, the When-Issued price should converge around the Auction Stop Yield Price, with any deviation (the Market Tail) being slight and non-biased.   Beginning in 2007, Plaintiffs' experts observed dramatic spikes in the spread between the When-Issued price and Auction Stop Yield Price—resulting in substantial Market Tails.   As demonstrated in the chart below—focusing on the Market Tails for 5-Year Treasury Notes—Plaintiffs' experts also identified a positive shift in the twelve-auction moving average of the Market Tails:



117.   The observations depicted in the chart above strongly suggest that Defendants— beginning in 2007, through coordination of trading activities and the sharing of confidential client auction bidding order flow—were able to manipulate the market for U.S. Treasury Securities to their benefit and to the detriment of Plaintiffs and members of the Class.

118.    Defendants specifically intended to, and did cause, unlawful and artificial manipulation of prices for U.S. Treasury Securities and U.S. Treasury-Based Instruments and understood and knew to a substantial certainty, as active and sophisticated Primary Dealers, that manipulation of auction prices for U.S. Treasury Securities would have a direct corresponding effect on the secondary market and the market for U.S. Treasury-Based Instruments, and would cause actual damages to Plaintiffs and members of the Class.  Defendants benefitted from sharing confidential client auction bidding order flow and coordinating market activities.

119.    Defendants' manipulation of the U.S. Treasury Securities and U.S. Treasury-Based Instruments markets caused injury to Plaintiffs and members of the Class who transacted in the manipulated markets, in securities trading at artificial prices, and/or in markets with artificial price trends during the Class Period.

120.    Plaintiffs and members of the Class were harmed each time they traded in the U.S. Treasury Securities or U.S. Treasury-Based Instruments markets.  Plaintiffs' and Class members' injuries flow directly from Defendants' collusive manipulation of the U.S. Treasury Securities or U.S. Treasury-Based Instrument markets and their anticompetitive conduct.

121.    The consequences of Defendants' conduct were foreseeable and Defendants knowingly, intentionally, and/or recklessly caused such harm and injury to Plaintiffs and members of the Class.

122.    Defendants' collusion to manipulate the U.S. Treasury market directly caused Plaintiffs' and Class members' actual damages in the form of diminished profits or increased losses on their transactions in U.S. Treasury Securities and U.S. Treasury-Based Instruments.

123.    The injuries to Plaintiffs and members of the Class flow directly from Defendants' collusive manipulation of prices for U.S. Treasury Securities or U.S. Treasury-

Based Instrument, which replaced prices set through competition among horizontal competitors. The injuries suffered by Plaintiffs and members of the Class are of the type antitrust laws were designed to prevent.

**EQUITABLE TOLLING OF THE STATUTES OF LIMITATIONS**

124.    Defendants actively and effectively concealed their collusion, as alleged herein, from Plaintiffs and members of the Class.  As a result of Defendants' concealment, all applicable statutes of limitations affecting Plaintiffs' and the Class' claims have been tolled.

125.    Defendants' conspiracy was, by its very nature, secretive and self-concealing. Defendants engaged in a form of market manipulation which could not be detected by Plaintiffs or members of the Class.  The secret nature of Defendants' conspiracy, which relied on non-public methods of communication to collude with each other and other co-conspirators to manipulate the auction of U.S. Treasury Securities and the trading of U.S. Treasury Securities and U.S. Treasury-Based Instruments, prevented Plaintiffs and members of the Class from uncovering Defendants' unlawful conduct.

126.    Moreover, upon information and belief, Defendants actively conspired to conceal their unlawful conduct.  Throughout the Class Period, Defendants, both individually and in concert, actively participated in the concealment of the scheme by misrepresenting their practices as Primary Dealers of U.S. Treasury Securities.

**CLASS ACTION ALLEGATIONS**

127.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons or entities who, between January 1, 2007 and the present (the "Class Period"), purchased or sold bonds, notes, or other marketable securities issued by the U.S. Department of

35

Treasury, and all persons or entities who purchased or sold futures, options, or other derivatives based on such bonds, notes, or other marketable securities issued by the U.S. Treasury Department during the Class Period.

Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint.

128.    Plaintiffs believe that there are at least tens of thousands of members of the Class described above, making the Class so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

129.    There are questions of law and fact common to each member of the Class that relate to the existence of the conspiracy alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate the prices of U.S. Treasury Securities and U.S. Treasury-Based Instruments in violation of the Sherman Antitrust Act;

b.    the identity of the participants in the conspiracy;

c.    the duration of the conspiracy;

d.    the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and members of the Class;

f.    whether Defendants and their co-conspirators concealed the conspiracy's existence from Plaintiffs and members of the Class;

g.      whether Defendants specifically intended to, and did in fact, manipulate prices of exchange-traded U.S. Treasury-Based Instruments, including U.S. Treasury futures and options traded on the CBOT;

h.      whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole;

i.      the appropriate injunctive and equitable relief for the Class; and

j.      the appropriate measure of damages sustained by Plaintiffs and members of the Class.

130.    During the Class Period, Plaintiffs purchased U.S. Treasury Securities and their interests are aligned with, and not antagonistic to, the interests of the other members of the Class. Plaintiffs are members of the Class, have claims that are typical of the claims of the other members of the Class, and will fairly and adequately protect the interests of the other members of the Class.  In addition, Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and other complex class action litigation.

131.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

132.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

133.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Moreover, prosecution of this litigation as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate antitrust claims such as the ones asserted in this Complaint.  This litigation presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR VIOLATION OF § 1 OF THE SHERMAN ACT

134.    Plaintiffs hereby restate and incorporate the preceding paragraphs as if fully set forth herein.

135.    Defendants and their co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

136.    During the Class Period, Defendants were competitors in the market for U.S. Treasury Securities and U.S. Treasury-Based Instruments.  Nevertheless, Defendants shared with each other competitively sensitive data, such as client auction bidding order flow and Defendants' respective desires for the direction of price movements in auctions of U.S. Treasury Securities and the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments, and worked in concert to move prices in the direction they desired, to the detriment of Plaintiffs and members of the Class.

137.    Prices of U.S. Treasury Securities and U.S. Treasury-Based Instruments were distorted by Defendants' attempts to manipulate the auction process for U.S. Treasury Securities. As such, Plaintiffs and members of the Class were deprived of the benefit of a fully competitive market for U.S. Treasury Securities and U.S. Treasury-Based Instruments.  For instance, members of the Class who purchased or sold U.S. Treasury Securities on the secondary market did so at unfavorable prices as the result of Defendants' collusive, manipulative, anticompetitive, and unlawful conduct.

138.    Similarly, members of the Class members who purchased or sold U.S. Treasury-Based Instruments were also harmed by Defendants' collusion, as the prices of those instruments were tied to the prices of U.S. Treasury Securities, which, due to Defendants' collusive, manipulative, anticompetitive, and unlawful conduct, did not reflect actual market rates.

139.    Moreover, Defendants' collusive, manipulative, anticompetitive, and unlawful sharing of competitively sensitive data, such as client auction bidding order flow and Defendants' respective desires for the direction of price movements in auctions of U.S. Treasury Securities and the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments, allowed Defendants to trade ahead of Plaintiffs and members of the Class who purchased and sold U.S. Treasury Securities in the secondary market and/or U.S. Treasury-Based Instruments.

140.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.  The conspiracy involved joint coordination among horizontal competitors to affect the prices of U.S. Treasury Securities auctioned by the U.S. Treasury.  Moreover, the conspiracy resulted in substantial anticompetitive effects in the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments.  There is no legitimate business justification for, nor are any procompetitive benefits caused by, Defendants' conspiracy and the acts taken in

furtherance thereof.  Any ostensible procompetitive benefits of the conspiracy were pretextual and could have been achieved by less restrictive means.

141.    As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, Plaintiffs and members of the Class have suffered injury to their business or property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

142.    Plaintiffs and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

143.    Plaintiffs and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT

144.    Plaintiffs hereby restate and incorporate the preceding paragraphs as if fully set forth herein.

145.    Defendants, through their manipulative acts alleged herein, specifically intended to, and did in fact, manipulate prices of exchange-traded U.S. Treasury-Based Instruments, including U.S. Treasury futures and options traded on the CBOT, in violation of Sections 6(c) and 9(a) of the Commodity Exchange Act, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. §§ 180.1 and 180.2 promulgated thereunder.

146.    Defendants intended that their wrongful acts would result in prices of exchange-traded U.S. Treasury-Based Instruments being artificially priced during the Class Period.

147.     Defendants, due to their roles as Primary Dealers of U.S. Treasury Securities and a result of their significant market power, including their role as market makers, had the ability to influence prices of U.S. Treasury-Based Instruments, including U.S. Treasury futures and options traded on the CBOT.

148.     As a result of Defendants' conduct described herein, Defendants caused the prices of exchange-traded U.S. Treasury-Based Instruments to be artificially priced during the Class Period.

149.     Members of the Class who transacted in U.S. Treasury-Based Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the Commodity Exchange Act.

150.     Defendants' conduct violated Sections 6(c) and 9(a) of the Commodity Exchange Act, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. §§ 180.1 and 180.2 promulgated thereunder.  As such, Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

## THIRD CLAIM FOR PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

151.     Plaintiffs hereby restate and incorporate the preceding paragraphs as if fully set forth herein.

152.     Each Defendant is liable under Section 2(a)(1)(B) of the Commodity Exchange Act, 7 U.S.C. § 2(a)(1)(B), for the conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office, carried out in violation of the Commodity Exchange Act.

153.     As a result of Defendants' liability for the unlawful conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office,

Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

## FOURTH CLAIM FOR AIDING AND ABETTING MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT

154.    Plaintiffs hereby restate and incorporate the preceding paragraphs as if fully set forth herein.

155.    Each Defendant is liable under Section 13 of the Commodity Exchange Act, 7 U.S.C. § 13c, as a principal violator of the Commodity Exchange Act due to each Defendants' willful aiding, abetting, counseling, commanding, and/or inducing the violations of the Commodity Exchange Act described herein.

156.    Each Defendant is further liable under Section 13 of the Commodity Exchange Act, 7 U.S.C. § 13c, as a principal violator of the Commodity Exchange Act due to each Defendants' actions in combination or concert with other Defendants in order to effect the violations of the Commodity Exchange Act described herein.

157.    As a result of Defendants' liability for their aiding and abetting of the violations described herein, and for the unlawful conduct of their co-conspirators, Defendants are liable for damages pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

## PRAYER FOR RELIEF

158.    Plaintiffs demand relief as follows:

a.    that the Court certify this lawsuit as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

42

b.      that the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act and the Commodity Exchange Act;

c.      that Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

d.      that the Court award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a), and for their violations of the Commodity Exchange Act, plus interest;

e.      that the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

f.      that the Court direct any such further relief that it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

159.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 23, 2015

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

Joseph H. Meltzer
Sharan Nirmul
Darren J. Check
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
snirmul@ktmc.com
dcheck@ktmc.com

*Counsel for Plaintiffs Beaver County
Employees' Retirement Fund, Erie County
Employees' Retirement System, and
Lackawanna County Employees' Retirement
Fund*

44